598 So.2d 676 (1992)
Norma Ray MATHIEU, et al., Plaintiffs-Appellees,
v.
STATE of Louisiana, DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, Defendant-Appellant.
No. 90-1059.
Court of Appeal of Louisiana, Third Circuit.
April 16, 1992.
Writ Denied June 26, 1992.
*677 Todd L. Farrar, Ball, for defendant-appellant.
Watson, Murchison, Crews, Arthur & Corkern, Steve Crews, A.J. Gregory, Jr., Natchitoches, for plaintiffs-appellees.
Before DOUCET and KNOLL, JJ., and JOSEPH E. COREIL,[*] J. Pro Tem.
KNOLL, Judge.
This appeal concerns the wrongful death of John Mathieu in an automobile accident resulting from a 4-6 inch shoulder drop-off in rural Sabine Parish. Defendant, State of Louisiana Department of Transportation and Development (DOTD), appeals the finding of liability and alternatively, that the court awarded excessive damages. We affirm.

*678 FACTS
On April 18, 1981, it was John Mathieu's birthday. He was 61 years of age. He was proceeding south on Louisiana Highway 475 in rural Sabine Parish to a local grocery store at approximately 4:38 p.m. His family had purposefully sent him on an errand so that they could complete the final preparations for his surprise birthday party later that afternoon.
Traveling north on that same highway, the driver, Huey Ferguson and his two passengers, Benjamin Rivers and David Rivers, were returning from a bar-b-que near Toledo Bend. All three had been drinking beer that day. As Ferguson entered a left hand curve known as "Coon Ridge", he inadvertently drifted onto the eroded dirt shoulder and attempted to reenter the northbound lane. His pickup truck left the shoulder, traveled across the northbound lane, crossed the center line and struck the Mathieu vehicle on the driver's side door and front fender. Mathieu was killed instantly.
Neither Ferguson nor his two passengers recall anything about the accident. Photographs taken at the accident scene that day show "yaw marks" (tire marks on a roadway resulting from an extreme steering maneuver) in a smooth arcing pattern from the edge of the roadway and into the southbound lane. The roadway edge where the right front tire of the Ferguson vehicle reentered is raveled with a 4-6 inch drop-off.
The surviving spouse, Norma Ray Matheiu, and their three children, Leah Mathieu Eddington, Robert J. Mathieu and Sara Beth Mathieu Loe, filed suit against DOTD, Louisiana Department of Public Safety, Huey Ferguson and his insurer, Dairyland Insurance Company. Following several supplemental and amending petitions, Ferguson and Dairyland were dismissed after tendering the policy limits of the Dairyland insurance policy.
At trial on the merits on March 1 and 2, 1990, Norma Ray Mathieu and DOTD filed three joint stipulations. First, the roadway was built according to the existing design standards in effect at the time of construction. Secondly, the Louisiana Department of Public Safety is not at fault for issuing driving privileges to Ferguson. Thirdly, if Ferguson and DOTD are adjudged as joint tortfeasors, then the recovery of Norma Ray Mathieu, individually, shall be reduced by 50%.
Following trial, the trial court adjudged DOTD liable to plaintiffs as follows:
A) Wrongful death claim of Norma Ray Mathieu: $350,000
B) Economic Loss of Norma Ray Mathieu: $100,000
C) Wrongful death claim of Robert Joseph Mathieu: $250,000
D) Wrongful death claim of Leah Mathieu Eddington: $250,000
E) Wrongful death claim of Sara Beth Mathieu Loe: $250,000
F) Burial expenses: $5,390.95.
The trial court also assessed expert witness fees of $10,850.80 and costs of trial to DOTD.

LIABILITY OF DOTD
In Coleman v. State, Through DOTD, 524 So.2d 1281, 1284-1285 (La.App. 3rd Cir. 1988), Judge Laborde, as organ for this court, summarized the law concerning highway shoulders:
"DOTD has the basic duty to maintain all highways in the state highway system. The maintenance of highway shoulders in a reasonably safe condition is included within the duties of DOTD, and this duty encompasses the obligation to protect a motorist who inadvertently drives onto the shoulder. Although DOTD is not an insurer of the safety of motorists using state highways, it can not knowingly allow a condition to exist which is hazardous to a reasonably prudent motorist. DOTD may be liable for negligence if it is actually or constructively aware of the hazardous condition or defect and fails to take corrective action within a reasonable time. DOTD may also be held strictly liable under LSA-C.C. art. 2317 as custodian of a defective shoulder in normal use. Under both a negligence theory of liability or strict liability, liability *679 will hinge on whether or not DOTD breached its duty to the plaintiff. Thus the State will be liable if it knew of the defect and even if it did not know of the defect under Article 2317. The strict liability of Article 2317 is subject to the defenses of victim fault, fault of a third party, or action by an irresistible force." (Citations omitted.)
An abrupt drop-off between a roadway and a shoulder constitutes a defect. LeBlanc v. State, Department of Highways, 419 So.2d 853 (La.1982). An implicit necessity for the use of a shoulder is a connection between the roadway and the shoulder that allows for safe, gradual movement from one to the other. Sinitiere v. Lavergne, 391 So.2d 821 (La.1980).
Only upon a showing of manifest error will an appellate court disturb a trial court's factual findings. Hood v. State Through DOTD, 587 So.2d 755, 759 (La. App. 2nd Cir.1991), writ denied, 570 So.2d 81-82 (La.1991).
In the case sub judice, the record shows the following evidence.
James Napier, the state police officer who investigated the accident, testified that he arrived at the scene at approximately 4:45 p.m., seven minutes after the accident. Trooper Napier observed tire marks on the blacktop road beginning near the dirt shoulder of the northbound lane, across the center line and ending approximately six feet into the southbound lane. Trooper Napier characterized the tire marks as "skip skids"tire marks left on the roadway when the front wheels are turned, but the vehicle does not proceed in the desired direction. He also testified that eyewitnesses to the accident referred to as "Turner" (who did not testify at trial) and Benjamin Rivers informed him that Ferguson entered the curve too fast, ran off the road and lost control of the pickup truck as he reentered the roadway. Based on his investigation at the accident scene, Trooper Napier concluded that Ferguson was intoxicated and also volunteered testimony that Ferguson subsequently pleaded guilty to negligent homicide (LSA-R.S. 14:32.1).
John List, a member of the Many Rescue Squad, testified that the shoulder area where the Ferguson truck entered the roadway was 4-6 inches lower. List elaborated on the shoulder washout as a common problem on that portion of the highway and that DOTD had repeatedly placed filler dirt in the eroded area. List explained that during every rain, the runoff water would carry away the filler dirt and expose the 4-6 inch dropoff again.
Bernice Green, the Sabine Parish DOTD superintendent at the time of the accident, testified that Louisiana Highway 475 is an old road and only emergency maintenance was done as needed. State highways are inspected every two weeks and the particular section of highway where the accident happened had been repaired numerous times.
Green narrated the dated maintenance reports of repairing the shoulder and edge of the roadway with filler dirt as follows: September 4, 1980; October 16, 1980; December 13, 1980; February 26, 1981; March 3, 1981; and March 9, 1981. The final reported maintenance on the roadway and shoulder including rebuilding the eroded dirt shoulder and cleaning and reshaping the ditches is April 20-28, 1981two days after the fatal accident. He acknowledged the presence of an eroded dirt shoulder at the accident site, but stated that he knew of no "bad spots" since his last inspection of April 2, 1981.
Gene B. Moody, an expert in highway design maintenance, structural engineering and road construction, testified that the roadway and shoulder have the recurring problem of "edge raveling" caused by erosion from water flow along and across the roadway. Moody attributes the erosion to the lack of drainage by ditches along the roadway and explained that if the ditches do not properly drain, then the roadway becomes the drainage surface. This causes edge raveling by eroding the soil base along the edge of the roadway and leads to the breaking and chipping off of the highway surface.
Moody also testified that the drainage problem at the accident site has existed for *680 years and expressed disbelief that DOTD could not have recognized the problem. Moody emphasized that DOTD's repeated attempts of correcting the eroded shoulder by rebuilding it with filler dirt treated only the symptoms of the drainage problem. Moody explained that DOTD's corrective action of cleaning and reshaping the drainage ditches two days after the accident to facilitate proper drainage was the proper course of action, albeit late.
Raymond Charles Burkart, Jr., an accident reconstruction expert, testified that this accident was typical of a shoulder drop-off situation wherein an automobile leaves the roadway, travels along the shoulder, the driver oversteers the vehicle to climb the 4-6 inch drop-off wall and, failing to compensate for the oversteering quickly enough, strikes an automobile in the oncoming lane of travel. Burkart alluded to the tell-tale sign of "yaw marks" from the Ferguson vehicle as a common component in a shoulder drop-off case. He explained that yaw marks are created when the load of a vehicle is shifted to the outer part of the tire usually because of an extreme steering maneuver. He opined that the 4-6 inch shoulder drop-off contributed to the accident since the Ferguson vehicle was not beyond recovery while straddling the shoulder just before encountering the raveled edge of the roadway. Burkart estimated the Ferguson vehicle was traveling at approximately 35-45 miles per hour at impact.
Oscar F. Griffith, an accident reconstruction expert, also testified that the shoulder drop-off played a role in the accident. He explained in detail that in a situation where the shoulder is level to the roadway, a motorist who wanders onto the shoulder would be able to feel the effort of gradually steering back onto the roadway. However, where the shoulder is 4-6 inches lower than the roadway as in this case, an extra amount of steering force is needed to climb the drop-off, but not needed once the wheels touch the roadway. This oversteering toward the left caused the Ferguson automobile to yaw in a counterclockwise rotation, cross the center line and strike the oncoming Mathieu vehicle in the southbound lane. Griffith placed the speed of both vehicles at 30-40 miles per hour just before impact.
Testifying on behalf of DOTD, Ned E. Walton, an expert in highway design, traffic engineering and accident reconstruction, estimated the shoulder drop-off to be 3 inches. Walton attributes the accident to Ferguson's excessive speed and oversteering and opined that the edge raveling did not contribute to the accident. He explained that since the shoulder drop-off is a jagged edge rather than a smooth vertical wall, only one-half degree of steering was necessary to cross it. Walton examined the yaw marks and concluded that the condition of the shoulder did not contribute to the accident since: A) the left wheel of the Ferguson vehicle is yawing before the right wheel encounters the raveled edge; and B) the configuration of the yaw marks is a smooth arc and never makes an abrupt change. However, on cross-examination Walton acknowledged that yaw marks are common in shoulder drop-off cases.
In the case sub judice, the record evidence preponderates that the cause-in-fact of the accident was the shoulder drop-off. Uncontradicted testimony described the shoulder drop-off as 4-6 inches and its recurring nature despite DOTD's corrective measures both before and after the accident. Expert testimony explained the causes behind shoulder erosion, the significance of yaw marks at an accident scene and the result of oversteering to climb a shoulder drop-off as in this case. Only DOTD's expert witness concluded that the yaw marks show that the condition of the shoulder did not cause the accident.
Furthermore, we are not persuaded by DOTD's argument that the sole cause-in-fact of the accident is Ferguson's alleged excessive speed and alleged intoxication. The only evidence that remotely shows that the negligence of Ferguson is the sole cause-in-fact of the accident was testimony from DOTD's expert, Ned E. Walton, and hearsay testimony from Officer Napier. On cross-examination, Walton conceded that yaw marks are characteristic of drop-off *681 cases and none of his diagrams upon which he based his conclusions included a curve such as in the present case. Considering the paucity of evidence, we find the trial court did not err in concluding that the cause-in-fact of the accident was the concurrent negligence of Ferguson and the presence of a 4-6 inch shoulder drop-off.
Our careful review of the record convinces us that the trial court did not err in adjudicating DOTD liable for the death of John Mathieu. The trial court is in the best position to assess the evidence and we will not disturb its reasonable conclusions in view of the record evidence.

DAMAGES
DOTD appeals the damage award and contends the trial court erred in its valuation of loss of earnings and wrongful death awards to the surviving spouse and three children. In brief, DOTD urges that the awards should be reduced and fall in line with Rawls v. Morris, 470 So.2d 531 (La. App. 1st Cir.1985) wherein the court awarded $60,000 to the wife of the decedent and $30,000 to the daughter of the decedent.
Elements of damage for wrongful death are loss of love and affection, loss of services, loss of support, medical expenses and funeral expenses. Damages for wrongful death are intended to compensate the victim's beneficiaries for their compensable injuries following the victim's moment of death. Pierre v. Lallie Kemp Charity Hosp., 515 So.2d 614 (La.App. 1st Cir.1987), writ denied, 515 So.2d 1111 (La. 1987).
The survival action in a suit resulting from the death of a tort victim includes recovery for pain and suffering, loss of earnings and other damages sustained by the victim up to the moment of death. Damages for pain and suffering are properly awarded if there is a scintilla of evidence of any pre-death pain or suffering by the victim. Prince v. Mattalino, 583 So.2d 541 (La.App. 3rd Cir.1991).
A lump sum judgment of damages is presumed to award all items of damage claimed and the appellant's burden of proving that the trial court abused its discretion is more difficult than usual because the intention to award a specific amount for any particular item is not ascertainable. Taylor v. Dupree, 484 So.2d 986 (La.App. 3rd Cir.1986), writ denied, 488 So.2d 201 (La.1986).
The initial inquiry is always whether, after reviewing the circumstances surrounding the award, the trier of fact abused its great discretion in its award. Only after concluding that the trier of fact did indeed abuse its discretion by awarding an excessive amount, will the reviewing court resort to an analysis of prior awards under similar circumstances to reduce the award to an appropriate amount. Monceaux v. Jennings Rice Drier, Inc., 590 So.2d 672 (La.App. 3rd Cir.1991); Bourgeois v. Puerto Rican Marine Manage., 589 So.2d 1226 (La.App. 4th Cir.1991), writ denied, 592 So.2d 1299-1300 (La.1991).
We will first examine the award for loss of economic support. The trial court set this award at $100,000. At trial two experts testified about the economic loss. Dr. Earl G. Thames, plaintiff's expert in the field of economics, estimated Mathieu's loss of income at $155,988.27. Dr. Thames based his figure on several income tax returns from the Mathieus. He assumed that Mathieu would have earned a minimum of approximately $69,056 over the next nine years, (until Mathieu attained the age of 70) in his self-employment as a fishing guide. Dr. Thames based this figure on Mathieu serving as a guide for two parties a week for two days at approximately $100 per day or $200 per week. Mrs. Mathieu told Dr. Thames that her husband received between $100 to $125 a day as a guide in the early 1980's. Dr. Thames ascertained that at the time of trial, some guides received $150 per day. Therefore, Dr. Thames opined his figure was a conservative projection of Mathieu's earnings as a guide. On cross-examination, Dr. Thames acknowledged that he had no documentation to verify Mathieu's income for the three years prior to Mathieu's death, but emphasized that his final figure *682 did not include any income from the family-owned marina.
Turning to loss of household services, Dr. Thames projected a minimum loss of $88,303.18. He based this figure on Mathieu being in good health and having statistics on household services. He did not use all of the household services because the children were mostly grown. Therefore he restricted his projection to 6.25 hours per week for repairs and maintenance around the home, plus mowing the lawn, etc. Dr. Thames felt 6.25 hours per week was conservative because the average person spends 15.1 hours per week in household duties. He computed this amount beyond the age of 70. He testified "I carried those on out, because that would not stop at seventy (70). It would have continued as long as he had lived."
Dr. Jan W. Duggar, defendant's expert in economics, estimated the economic loss at $19,894. Assuming a work-life expectancy of 5.3 years, Dr. Duggar calculated Mathieu's loss of income at $11,294 and a loss of household services at $6,360. His lower figures are based on assumptions that the Mathieus had no income in the years 1978 through 1981 in which no federal income tax returns were filed and the relatively low cost of providing services to the household after the children have grown and left the family home.
Considering the contradictory evidence, we cannot say that the trial court abused its discretion in awarding $100,000 for the economic loss attributable to Mathieu's death.
Finally, DOTD argues that the wrongful death awards to Norma Ray Mathieu and the three major children of $350,000 and $250,000 each, respectively, are excessive.
In fixing these amounts, the learned trial court stated in its reasons for judgment:
"The facts of this case are especially tragic. Mr. Mathieu was killed on his birthday. The family was and is extremely close. His widow and children were devastated by his sudden death. Even though the trial was held several years post accident, the lingering sadness and loss were quite evident to the court. Mr. Mathieu unselfishly gave of his love and support to his family and friends. They in turn felt true affection and respect for him. He left behind as evidenced by his wife and children, a living legacy to his qualities of honesty, affection, optimism, hard work and dedication to family. The record herein justifies maximum compensation to this family."
Louisiana courts have often upheld large wrongful death awards as reasonable in cases where the decedent and the surviving spouse and minor children had extraordinarily close and loving relationships. Ingram v. Caterpillar Machinery Corp., 535 So.2d 723 (La.1988) (lump sum award of $500,000 to the surviving spouse and two children); Hellmers v. Dept. of Transp. & Development, 503 So.2d 174 (La.App. 4th Cir.1987), writ denied, 505 So.2d 1141 (La. 1987) ($325,000 to surviving spouse and $225,000 to each of decedent's three children); Comberrel v. Basford, 550 So.2d 1356 (La.App. 5th Cir.1989), writs denied, 556 So.2d 1284-1286 (La.1990) ($330,000 to surviving spouse and $200,000 and $150,000, respectively to decedent's two children).
At trial, Mrs. Mathieu described her marriage of 28 years to John Mathieu as a close relationship wherein they shared the many joys of marriage together as well as enduring an occasional crisis such as his struggle with encephalitis in 1964. She recounted their many fishing and hunting trips and also her bout with colon cancer wherein she described him as a caring and patient husband who helped her recover from the traumatic surgery. She likened their marriage to a priceless antique cup set in which the loss of her husband renders the remaining antique cupherself worthless. In a nutshell, the two were an inseparable team that shared virtually every aspect of life together and his death left a painful void in her life.
All three children, Robert J. Mathieu, Sara Beth Mathieu Loe and Leah Mathieu Eddington, ages 27, 24 and 17 at the time *683 of their father's death, respectively, described the decedent as a loving and caring father who was devoted to his children. Robert testified that he has many good memories from numerous hunting and fishing trips with his father and described him as someone he could confide in and seek advice from on any problem. Robert describes himself as numb and feeling as if he were dead upon driving up to the accident scene that day and learning of his father's death.
Sara Beth also spoke of their many camping and fishing trips and her father's attendance of her piano recitals. She regarded her father as someone she could approach with any problem and would receive a fair and honest answer regardless of the circumstances.
Leah described her father in the same light and testified that he was her "whole world" while growing up. She equated her father's untimely death as losing a part of her life and described her father's subsequent birthdays as lonely and painful reminders of his death.
The testimony shows that the sudden and unexpected death of John Mathieu was a traumatic and heartrending event that will affect his widow and three children indefinitely. Commensurate with the extraordinarily close and loving relationship between the decedent and his survivors, we agree with the trial court that maximum compensation is warranted and conclude that the awards of $350,000 to Norma Ray Mathieu and $250,000 to Robert J. Mathieu, Sara Beth Mathieu Loe and Leah Mathieu Eddington, each, are not manifestly erroneous.
For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to defendant, State of Louisiana, Department of Transportation and Development.
AFFIRMED.
NOTES
[*] Judge Joseph E. Coreil, Retired, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.