831 So.2d 1075 (2002)
Clifford DAVIS, Jr., et al.
v.
Charles WITT, et al.
No. 01-894.
Court of Appeal of Louisiana, Third Circuit.
November 13, 2002.
*1077 James L. Pate, Melissa L. Theriot, Laborde & Neuner, Lafayette, LA, for Defendant/Appellant, Sheriff Charles A. Fuselier, Jr.
Charles V. Musso, H. David Vaughan, II, Plauche, Smith & Nieset, Lake Charles, *1078 LA, for Plaintiffs/Appellees, Clifford Davis, Jr., et al.
Laura Putnam Shell, Assistant Attorney General, Lafayette, LA, for Defendant/Appellant, Louisiana State Police.
Mark L. Ross, Leonard & Leonard, Lafayette, LA, for Defendants/Appellees, Clifford Davis, Jr., et al.
Court composed of NED E. DOUCET, C.J., HENRY L. YELVERTON, ULYSSES GENE THIBODEAUX, COLOMBARO WOODARD and MICHAEL G. SULLIVAN, Judges.
THIBODEAUX, Judge.
In this bifurcated wrongful death case, plaintiffs, the children of Mary and Clement Davis, the decedents, (Davis Children) appeal the trial court's judgment apportioning the St. Martin Parish Sheriff's Office and the Louisiana State Police with twenty percent fault each for causing the death of Mary and Clement. On the other hand, the Sheriff's Office and State Police appeal the trial court's judgment that they were at fault in any percentage for the deaths of Mary and Clement. The Davis Children answered the defendants' appeal requesting an increase in the wrongful death damages awarded at trial.
We reverse the trial court's grant of the Davis Children's Judgment Notwithstanding the Verdict (JNOV) with respect to the State Police. We conclude that the facts and inferences do not point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict. We affirm the trial court's grant of the Davis Children's alternative motion for new trial against the State Police pursuant to La. Code Civ.P. art.1973. Further, we affirm the twenty percent assessment of fault against the Sheriff's Office. In response to the Davis Children's answer to the appeal for an increase in damages, we amend the trial court ruling regarding the amount of wrongful death damages and increase the damage amount to $200,000 per child for the death of each parent.

I.

PROCEDURAL HISTORY
Suit was filed by the Davis Children against Charles Witt, the driver of the eighteen-wheeler truck that collided with Mary and Clement's vehicle; Mr. and Mrs. Richard Ducote who tried to assist Witt in backing his truck from a parking lot into the roadway; the City of Breaux Bridge Police Department; the Sheriff's Office; and the State Police. The suit against the Breaux Bridge Police was dismissed on summary judgment due to lack of evidence of fault. The suit against the Ducotes was dismissed on the morning of trial by a stipulation of the parties that the Ducotes were not at fault. Finally, with respect to Witt, the Davis Children settled their claims against him, his employer and his insurer prior to trial.
A bifurcated trial in this matter was held on September 11, 2000 through September 15, 2000, against the remaining defendants. The claims against the State Police were tried by jury, and the claims against the Sheriff's Office were tried by the judge.
The jury rendered a judgment in favor of both the State Police and the Sheriff's Office finding both free from negligence in causing the accident and that Witt was the sole cause of the accident and deaths of Mary and Clement. The jury awarded wrongful death damages in the amount of $100,000 to each of the surviving ten children of Mary Clement and $100,000 to each of the surviving ten children of Clement Davis, for a total of $2,000,000.00. The *1079 jury also awarded damages for funeral and medical expenses.
Finding comparative fault on the part of the Sheriff's Office, the trial judge assessed the Sheriff's Office fault at twenty percent. Further, the trial court dismissed the Davis Children's claims against the State Police. The Davis Children filed a motion for judgment notwithstanding the verdict (JNOV). The Davis Children's JNOV sought an increase in their wrongful death damage awards and a finding of fault in the amount of fifty percent assessed to the State Police. The trial judge granted the plaintiffs' JNOV and assigned twenty percent fault to the State Police. Further, the trial court granted plaintiffs' motion for a new trial should his ruling on the JNOV be reversed by this court on appeal. The trial court did not increase the damage amount awarded to the Davis Children. It is from the grant of the JNOV and, alternatively, a new trial that the State Police appeal. The Sheriff's Office appeals seeking a reversal of the trial court's judgment finding it twenty percent at fault. The Davis Children appeal the trial court's allocation of only twenty percent fault to the Sheriff's Office and the State Police. The Davis Children also claim that the trial court's wrongful death damage awards are abusively low.

II.

FACTS
On May 11, 1997, Mother's Day, Mary and Clement Davis were killed when they collided with a truck loaded with creosote poles that extended seventeen feet past the end of the its trailer. The truck was driven by Witt, a truck driver from Mississippi. The collision occurred when Witt attempted to back across the eastbound lane of Louisiana Highway 94 at 9:12 p.m. The parties stipulated that the sun set at 7:51 p.m. on May 11, 1997. The defendants' actions leading up to the time of the collision form the basis of this wrongful death case.
Witt traveled from Mississippi down Louisiana Interstate 10 and exited in St. Martinville, Louisiana. Witt continued into Breaux Bridge. In Breaux Bridge, Witt stopped his truck at a business, the "Fruit Stand." Witt's intended destination was a business located in Cade, Louisiana known as "Gulf Coast Creosote Corporation." At the "Fruit Stand," Witt's truck was parked entirely off the road. Witt was concerned about continuing on his way after sunset because the creosote poles extended quite a bit past the end of the truck. Therefore, at 8:17 p.m. Witt contacted the Sheriff's Office to seek guidance on the need for an escort. The 8:17 p.m. call to the Sheriff's Office was the first of three such calls. With the exception of Witt's first call to the State Police, all of the calls were recorded and later transcribed for introduction into evidence at trial.
In his first call to the Sheriff's office Witt spoke with Sergeant Lorrie Breaux,[1] and acknowledged that he should not be on the road at sunset with the creosote poles protruding from the end of his trailer. Witt told Sgt. Breaux that he was located "just past Wal-Mart" and wondered if he needed an escort through town due to his load. At that point, Sergeant Breaux realized that Witt was within the city limits of Breaux Bridge. She transferred Witt to the city police department. Witt relayed his situation to Michelle Mullin of the Breaux Bridge City Police Department. Witt asked whether he could get an escort through town or whether he would have to *1080 stay parked until morning. Witt also told Ms. Mullin that it would be no problem for him to stay parked where he was until morning. Ms. Mullin informed Witt that he would have to contact the State Police because she did not know anything about providing an escort.
Witt contacted the State Police. Apparently Witt was told by the State Police that they could not help him because he was within the Breaux Bridge city limits; therefore, he again called the Sheriff's office seeking assistance. Sergeant Breaux told Witt that the city police had to take care of his situation. According to the transcript of his second conversation with Sergeant Breaux of the Sheriff's Office, Witt was told by Sergeant Breaux, with respect to the duties of the city police: "Yes, they sure can. You need to call, I'm going to call over there for you. Want you to stay on the line." She then asked Witt why he needed an escort. Witt explained as follows:
Well, here is the problem, I want to make sure that I'm not in a spot where I can get off the highway. I'm about 10 foot or maybe 8 foot off the highway right now, but with a 30 foot over hanger, 25 foot over hanger, I don't want to get hit.
Witt told Sergeant Breaux that he needed someone to block the traffic while he got on the road or direct him to a place where he could "pull into and get off the road." Witt explained to Sergeant Breaux that he only had twelve hours to get to his destination. Witt further explained that he needed someone to tell him of a place where he could pull his truck off the road because he did not have to leave until 8:00 a.m. Witt expressed concern about someone hitting the poles on his truck because the portion of the poles hanging past the trailer was not visible.
Although Sergeant Breaux told Witt that he could park his truck in the Wal-Mart parking lot, Witt informed Sergeant Breaux that he had already passed the Wal-Mart and that he could not turn around because he was hauling the seventy-foot poles. Sergeant Breaux told Witt that he could turn his truck around at the Sheriff Office substation. Sergeant Breaux gave Witt directions to the Sheriff's Office substation located on Mills Highway. Sergeant Breaux also told Witt that the substation had a big parking lot, and that she would let the substation personnel know that he was headed there to turn his rig around. Sergeant Breaux contacted Deputy Richard at the Sheriff's Office substation, and told him about Witt using the parking lot to turn his rig around.
Witt called the main Sheriff's Office back and again talked to Sergeant Breaux. He told Sergeant Breaux that he did not see the substation. Witt told Sergeant Breaux his location, and she determined that he passed the substation. Witt told Sergeant Breaux that he was in the parking lot of "Guidry Specialty Meats." Witt further explained that he could pull out of the parking lot but that he was afraid there would be an accident. Witt told Sergeant Breaux that he would rather be in the Wal-Mart parking lot. Sergeant Breaux informed Witt that the Sheriff's Office did not have anybody who could escort him and that since he was now on a state highway, she would contact the State Police.
It was 9:07 p.m. when Sergeant Breaux contacted the State Police. Witt explained his predicament to the State Police. It was determined that Witt was no longer within the city limits of Breaux Bridge. Sergeant Gros asked whether Witt was completely off the roadway. Witt answered in the affirmative. Witt explained *1081 that the problem with staying in the parking lot of Guidry Specialty Meats was that in the morning he would have to back his truck out onto the roadway because the lot was not big enough to turn his rig around to get out of the lot. Because of the length of his load, Witt told Sergeant Gros that he would rather have an escort to help him back out. Sergeant Gros told Witt that it would cost him $50.00 for a State Police escort. Witt declined the escort. The calls to the law enforcement authorities ended at 9:11 p.m.
Thereafter, Witt decided to back his truck out of the Guidry Specialty Meat store parking lot. At the same time, Clement and Mary were driving down Mills Road and collided with Witt's truck. Clement and Mary were killed as a result of the accident.

III.

ISSUES
We shall consider the correctness of:
(1) the trial court's apportionment of fault to the Sheriff's Office and the State Police;
(2) the trial court's grant of the plaintiffs' JNOV and, alternatively, a new trial against the State Police; and
(3) the trial court's award of wrongful death damages to the Davis Children.

IV.

LAW AND DISCUSSION

Fault of the State Police
Louisiana Code of Civil Procedure Article 1811 is the authority for a JNOV. In Davis v. Wal-Mart Stores, Inc., 00-445, pp. 4-5 (La.11/28/00); 774 So.2d 84, 89, the supreme court discussed the standard to be used in determining whether a trial court properly granted a JNOV:
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach a different conclusion, the motion should be denied. In making this determination, the court should not evaluate the credibility of the witnesses and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.
The standard of review for a JNOV on appeal is a two-part inquiry. In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion. If the facts and inferences point strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict, then the trial judge was correct in granting the JNOV. On the other hand, if reasonable persons in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion. Joseph v. Broussard Rice Mill, Inc., 00-628 (La.10/30/00); 772 So.2d 94. If this court determines that the trial court correctly applied its standard of review as to the jury verdict, the appellate court reviews the JNOV using the manifest error-clearly wrong standard of review. Davis, 774 So.2d at 89.
*1082 We find that the facts and inferences in the present case do not point so strongly and overwhelmingly in favor of the Davis Children, the moving parties, that reasonable persons could not arrive at a contrary verdict. The testimony of several witnesses contributed to the liability issue in this case. Sergeant Gros of the State Police testified that when Witt called him on the non-emergency telephone line, he could not ascertain Witt's exact location. Sergeant Gros felt that the local city police would be in a better position to understand where Witt was located and give assistance. It was Sergeant Gros's understanding that once the local police determined Witt was safely off the roadway, that he would stay there until morning. Eventually, Witt contacted the Sheriff's Office and got permission move his vehicle from the Fruit Stand to the Sheriff's Office substation farther down the road. When Witt made his second call to the State Police, Sergeant Gros assumed that Witt had been escorted to the parking lot of Guidry Specialty Meats. It was Witt who told Sergeant Gros that he would need an escort in the morning to back his truck out of the parking lot. Sergeant Gros gave Witt information about obtaining a State Police escort in the morning. Upon learning that the fee would be $50.00, Witt chose not to use the escort service. The telephone transcript of his second call to the State Police indicated that Witt knew that it was illegal for him to be on the road with his load after sunset. Sergeant Gros testified that he thought Witt would stay parked safely off of the road in the parking lot over night, and that had he known Witt would attempt to leave the parking lot, he would have done anything to make sure Witt stayed put.
There were also two expert witnesses who testified with respect to the actions of the law enforcement authorities. The Davis Children presented the testimony of Ken Katsaris, an expert in police procedures. Mr. Katsaris testified that the duties of the State Police include giving information and offering assistance to motorists, investigating vehicles that are parked illegally or that are abandoned. It was the opinion of Mr. Katsaris that the State Police acted inappropriately to Witt's second call for assistance. Mr. Katsaris testified that Sergeant Gros should not have allowed Witt to hang up after giving Witt information about the cost of an escort. Mr. Katsaris further testified that Sergeant Gros should have informed Witt that since he believed he needed an escort, that they would send a trooper out to determine Witt's situation. Mr. Katsaris further stated that Sergeant Gros should have told Witt to stay in the parking lot, especially since the sergeant was aware that Witt had already moved the truck from the Fruit Stand. Sergeant Gros testified, however, that he assumed Witt had an escort to the new location since Witt was aware of the illegality of moving his truck with the overhanging load after sunset.
The defendants presented the testimony of George Armbruster, a former law enforcement officer, as an expert in law enforcement policies and procedures. Mr. Armbruster testified that Sergeant Gros should have been aware that Witt would need some type of assistance to back his truck out of the parking lot but not necessarily police assistance. Armbruster also testified that Sergeant Gros acted appropriately during Witt's first call to the State Police given that Witt was unable to give the sergeant his exact location. Sergeant Gros was able to ascertain that Witt was located somewhere within the city limits of Breaux Bridge and directed Witt to the Breaux Bridge City Police. Further, Mr. Armbruster testified that the conversations *1083 between Witt and all of the law enforcement personnel indicated that Witt knew he should not drive his truck at night with the creosote poles overhanging his trailer by seventeen feet.
Ms. Debbie Ducote also testified. Witt went to her home on the night of the accident to make his second call to the State Police. Ms. Ducote told Witt that she knew the owners of the meat store personally, and that it would be okay for him to stay in the parking lot over night. She offered to call Mr. Guidry, the owner of the store, to confirm this. She further informed Mr. Witt that other trucks would be arriving at the store at 5:30 a.m. to make deliveries, and that they could assist him in backing out of the parking lot. Witt informed Ms. Ducote that he had already made arrangements to park overnight in the Wal-Mart parking lot, and that he was going there. Witt did not tell Sergeant Gros that he was going to leave the meat store parking lot when he finished the second conversation with the State Police.
Given the above testimony, we find that there was ample evidence in the record whereby reasonable persons could have reached a finding that the State Police was not at fault in causing the deaths of Mary and Clement.
In granting the Davis Children's motion for JNOV, the trial judge stated that should this court reverse the JNOV, he would grant the Davis Children's alternative motion for a new trial. Since we find that the trial judge improperly granted the JNOV, we must now determine if he properly granted the plaintiffs' motion for a new trial. La.Code Civ.P. art.1973 provides: "A new trial may be granted in any case if there is good ground therefore, except as otherwise provided by law." A trial judge has great discretion in determining whether to grant a new trial. Id. Accordingly, we will only reverse the trial judge's determination that a new trial should have been granted if we find that the trial judge abused his discretion in granting a new trial. Zatarain v. WDSU Television, Inc., 95-2600 (La.App. 4 Cir. 4/24/96); 673 So.2d 1181. However, new trials are not favored, especially when there is support for the judgment in the record. Fletcher v. Langley, 93-624 (La. App. 3 Cir. 2/2/94); 631 So.2d 693, writ denied, 94-521 (La.4/7/94); 635 So.2d 1139.
In Davis, the supreme court stated that a "motion for a new trial requires a less stringent test than for a JNOV as such a determination involves only a new trial and does not deprive the parties of their right to have all disputed issues resolved by a jury." Davis, 774 So.2d at 93. "Whether to grant a new trial requires a discretionary balancing of many factors." Id. In considering a motion for new trial, the trial judge may evaluate evidence without favoring any party and draw his own inferences and conclusions. "[T]he significant authority is the ability [of the trial judge] to assess the credibility of witnesses when determining whether to grant or deny the motion for a new trial." Id. Moreover, "[t]he fact that a determination on a motion for new trial involves [great] judicial discretion does not imply that the trial court can freely interfere with any verdict with which it disagrees." Id., citing, Wyatt v. Red Stick Serv., Inc., 97-1345 (La.App. 3 Cir. 4/1/98); 711 So.2d 745. Thus, as the supreme court noted in Davis, "[w]e are faced with the balancing of two very important concepts: the great deference given to the jury in its fact finding role and the great discretion given to the trial court in deciding whether to grant a new trial." Davis, 774 So.2d at 93.
In the instant case, Sergeant Gros, a trained state trooper testified that he did not send a state trooper to assist Witt *1084 after the first call because he could not ascertain Witt's location. Further, Sergeant Gros testified that he assumed Witt had been escorted to the parking lot of Guidry Specialty Meats when he received the second call from Witt. Sergeant Gros, with knowledge that Witt's load of seventy-foot creosote poles that extended seventeen feet beyond the end of the truck's trailer presented a hazard on the road whether day or night, did not ask Witt whether he had been escorted by law enforcement personnel from the his previous location at the fruit stand. Further, Sergeant Gros, with knowledge of the possible danger of Witt's truck being on the road, did not get assurance from Witt that he would not move the truck from the meat store parking lot and did not offer any alternative to a $50.00 escort service when he knew that what Witt really needed was traffic control while he backed out of the parking lot. Apparently, in determining that the Davis Children are entitled to a new trial, the trial judge assessed the credibility of Sergeant Gros and found his testimony lacking. Our thorough review of the record reveals no abuse of the trial court's discretion in granting a new trial.

Fault of the Sheriff's Office
As noted earlier, this was a bifurcated trial. The case against the Sheriff's Office was tried by the judge. The trial judge found the Sheriff's Office twenty percent at fault, and the jury found that the Sheriff's Office was without fault in causing the accident that killed Mary and Clement. Thus, the jury's verdict is different from that of the trial judge.
The threshold question in this case is the proper standard of review to be applied by this court in a bifurcated case where the jury and trial court rendered inconsistent verdicts. The proper standard of appellate review in bifurcated trials with inconsistent verdicts is not a settled question. A split exists in the circuits regarding the proper standard. The second and the fourth circuits have held that the proper standard is a de novo review of the record, without according any weight or deference to the factual findings of the judge or jury. Mayo v. Audubon Indem. Ins. Co., 26,767 (La.App.2d Cir.1/24/96); 666 So.2d 1290, writ denied, 96-0457 (La.4/1/96); 671 So.2d 325; Reichert v. State, Dep't of Transp. & Dev., 26,800 (La.App.2d Cir.5/8/96); 674 So.2d 1105; Smiley v. Sikes, 543 So.2d 1084 (La. App. 2d Cir.1989), writ denied, 548 So.2d 326 (La.1989). See also Beoh v. Watkins, 94-1086 (La.6/24/94); 640 So.2d 1325; McCullough v. Regional Transit Authority, 593 So.2d 731 (La.App. 4th Cir.1992), writ denied, 595 So.2d 655 (La.1992). However, this court and the first circuit have adopted a different standard which accords deference to the factual findings of the judge and jury and attempts to harmonize inconsistent results. Thornton v. Moran, 348 So.2d 79 (La.App. 1st Cir.), writ denied, 350 So.2d 897, 898, 900 (La. 1977); Felice v. Valleylab, Inc., 520 So.2d 920 (La.App. 3d Cir.1987), writs denied, 522 So.2d 562, 563 (La.1988); Hasha v. Calcasieu Parish Police Jury, 94-705 (La. App. 3 Cir. 2/15/95); 651 So.2d 865, writ denied, 95-667 (La.4/28/95); 653 So.2d 592, 593.
The approach adopted by the first circuit in Thornton v. Moran, and this court in Felice v. Valleylab, Inc. requires an initial determination that a conflict exists between the trial court's finding and the jury's finding. In the present case, only the trial judge had the authority to make a determination as to fault and the apportionment thereof as well as the amount of damages to be awarded with respect to the Sheriff's Office. This court held in Edwards v. Daugherty, 97-1542 *1085 (La.App. 3 Cir. 3/10/99); 729 So.2d 1112, writs denied, 99-2034, 99-1393, 99-1484 (La.9/17/99); 747 So.2d 568, 1105 that where there are inconsistent verdicts involving political subdivisions, there is no conflict between the jury and the trial judge verdicts. The reason is that the jury is prohibited from determining the liability of the political subdivision in the first place. Furthermore, this court in Hasha held that the "jury's allocation of fifty percent fault to the Police Jury" was not binding on the trial judge. However, the Sheriff's Office argues that the above rule announced in Edwards is "contrary to [s]upreme [c]ourt authority [as expressed in Lemire v. NOPSI, 458 So.2d 1308 (La.1984)] and is in conflict with other circuits." Hasha explained that the method of having the jury allocate fault to a public defendant not subject to adjudication by a jury is authorized by the supreme court's decision in Lemire due to the procedural statute implementing a comparative fault scheme. The court in Lemire held that a jury's verdict against a public body "is not an advisory opinion in that it is not designed to advise, counsel, or compel the trial judge in his independent judicial obligation as regards plaintiff's claim against the public agency." Lemire, 458 So.2d at 1310. The supreme court in Lemire further noted that "La[Code Civ.]P. art. 1812 merely facilitates the court's confecting a judgment consistent with the jury determination relative to plaintiff's entitlement to his claim against the private defendant." Id. Thus, we find that Lemire supports the position that the judgment of the trial court and the jury in this case with respect to the Sheriff's Office are not inconsistent since the jury could not adjudicate the Sheriff's Office fault and Lemire clearly states that a jury's adjudication of issues involving a public agency are not to influence a trial judge's "independent judicial obligation" with respect to the public agency defendant. Id. Therefore, we will review the trial judge's finding of fault against the Sheriff's Office under the manifest error-clearly wrong, standard of review. Rosell v. ESCO, 549 So.2d 840 (La.1989).
As noted above, the trial judge assessed the Sheriff's Office with twenty percent fault for causing the accident that resulted in the deaths of the Davis Children's parents. The trial judge wrote extensive and detailed reasons for his judgment against the Sheriff's Office using the duty/risk analysis to find that the Sheriff's Office, through its employee, Sergeant Breaux, acted negligently in handling the situation with Witt. We have reviewed the facts presented in this record and the trial court's extensive reasons for judgment pursuant to this court's standard of review under Stobart v. State Through Dept. of Transp. and Dev., 617 So.2d 880 (La.1993); Rosell; and, Clement v. Frey, 95-1119 (La.1/16/96); 666 So.2d 607 and find no manifest error in the trial court's conclusion that the Sheriff's Office was twenty percent at fault for the accident that caused the deaths of Mary and Clement.

Damages
The jury awarded wrongful death damages to the ten major children of Mary and Clement in the amount of $100,000 per parent for a total of $200,000 each. In granting the Davis Children's motion for JNOV and finding both the State Police and the Sheriff's Office twenty percent at fault for the accident, the trial court did not increase the amount of damages awarded to the Davis Children by the jury. The Davis Children answered the defendants' appeal seeking an increase in the damage amount asserting that the $200,000 damage amount per child for the loss of both of their parents is erroneously *1086 low. Not surprisingly, the defendants assert that the damage award should not be disturbed.
This court reviews awards of general damages pursuant to the standard announced in Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993) and Cockerham v. Atlantic Richfield Co., 615 So.2d 547 (La.App. 3 Cir.), writ denied, 623 So.2d 1303 (La.1993). Our review of the record in its entirety shows a loving, attentive and very close family. All ten of the adult children of the decedents maintained regular contact with their parents, with the two youngest children, Kathleen Davis and Clement Davis, Jr., having daily contact because they had lived in the house with their parents. General damages are not susceptible to exact measurement, and much discretion is left to the trial court to assess reasonable damages. La. Civ.Code art.1999. Before the court of appeal can disturb an award of general damages, the record must clearly reveal an abuse of that discretion. American Motorist Ins. Co. v. American Rent-All, 579 So.2d 429 (La.1991); Reck v. Stevens, 373 So.2d 498 (La.1979); Coco v. Winston Indus. Inc., 341 So.2d 332 (La.1976). The award may be amended only after such a determination is made, and then only to the extent of lowering or raising the award to the lowest or highest amount reasonably within the trial court's discretion. Coco v. Winston Indus., 341 So.2d 332. Our finding of an abuse of discretion allows us to then consider whether prior awards for truly similar injuries are out of proportion to the instant award. Boswell v. Roy O. Martin Lumber Co., 363 So.2d 506 (La. 1978).
Kathleen and Clement Jr. were twenty years old and eighteen years old at the time of their parents death. Kathleen, the decedents' ninth child and Clement, the decedents' tenth child along with Kathleen's son lived with their parents prior to their parents' deaths. All of the children, although majors, testified regarding the close relationship they had with their parents. All of the children testified that they would get together at their parents house on Sundays and many holidays. In fact, all of the children were visiting with their parents on the date of their death because it was Mother's Day. They also testified that Mary and Clement were more than just parents. They were their friends. Further testimony from the children revealed that their parents were very close to each other, doing almost everything together. Evidence in the record reveals that both Mary and Clement were healthy and very active and willing to help out their children, friends and neighbors. Clement fished and enjoyed hunting. Clement also liked to play pool and cards with his family. Both Mary and Clement helped take care of their grandchildren, seeing them off to school and being home when school was over. Mary liked to go shopping, to cook and go to the mall. Patricia Ann Caillouet testified that going shopping was something special she and her mother enjoyed doing together. All of the children testified that their parents were always there for them and that it is very hard being without them. Patricia testified that when something important happens her parents are no longer alive to give advice. The children testified that they always think about their parents. What is significant in this case is that the children lost both parents at one time in a tragic accident on a day set aside to honor their mother. Another indication of the closeness of this family is the fact that eight of the children still lived in Breaux Bridge after leaving their parents' house, two of the children actually lived with their parents, and the other two lived only a short driving distance away from their *1087 parents, one in New Iberia, Louisiana and the other in Lake Charles, Louisiana.
Under the above noted facts, we find that the trial court award of $200,000 each, $100,000 for the loss of their mother and another $100,000 for the loss of their father is abusively low. Louisiana courts have often upheld large wrongful death awards as reasonable in cases where the decedent and the surviving spouse and minor children had extraordinarily close and loving relationships. Ingram v. Caterpillar Mach. Corp., 535 So.2d 723 (La.1988) (lump sum award of $500,000 to the surviving spouse and two children); Hellmers v. Department of Transp. & Dev., 503 So.2d 174 (La.App. 4 Cir.1987), writ denied, 505 So.2d 1141 (La.1987) ($325,000 to surviving spouse and $225,000 to each of decedent's three children); Comberrel v. Basford, 550 So.2d 1356 (La.App. 5th Cir.1989), writ denied, 556 So.2d 1284-86 (La.1990) ($330,000 to surviving spouse and $200,000 and $150,000, respectively to decedent's two children); McGrail v. Lee, 35,756 (La.App. 2 Cir. 4/3/02); 814 So.2d 729 ($750,000 each to decedent's three children).
In their brief, the Davis Children direct this court to the cases of Bozeman v. Reed, 92-858 (La.App. 1 Cir. 3/11/94); 633 So.2d 944, writ denied, 94-840 (La.6/24/94); 640 So.2d 1345 and Mathieu v. State Through Dep't. of Transp. & Dev., 598 So.2d 676 (La.App. 3 Cir.), writ denied, 600 So.2d 665 (La.1992) as guidance to the amount of damages they should be awarded for the wrongful death of both of their parents. In Bozeman, like the present case, the plaintiffs lost both of their parents in a single car accident. Two major children of the deceased received wrongful death damages in the amount of $225,000 per parent for a total in wrongful death damages of $450,000 each. The facts in Mathieu are similar to those in the present case in that the day of their father's death was a special dayhis birthday. The family had planned a surprise birthday party for their father. In the present case, the Davis Children's parents had been celebrating Mother's Day. We stated in Mathieu that the elements of damage for wrongful death are:
loss of love and affection, loss of services, loss of support, medical expenses and funeral expenses. Damages for wrongful death are intended to compensate the victim's beneficiaries for their compensable injuries following the victim's moment of death. Pierre v. Lallie Kemp Charity Hosp., 515 So.2d 614 (La. App. 1 Cir.1987), writ denied, 515 So.2d 1111 (La.1987).
Mathieu, 598 So.2d at 681.
In Mathieu we also noted the trial court's statement that:
The facts of this case are especially tragic. Mr. Mathieu was killed on his birthday. The family was and is extremely close. His widow and children were devastated by his sudden death ... the lingering sadness and loss were quite evident to the court. Mr. Mathieu unselfishly gave of his love and support to his family and friends. They in turn felt true affection and respect for him.
Mathieu, 598 So.2d at 681. This court affirmed wrongful death awards in the amount of $250,000 to Mathieu's major children. Evidence in the present case is strong that the Davis Children enjoyed an especially close and loving relationship with their parents. Moreover, the Davis Children lost both of their parents on a very special dayMother's Day, a day that in the future will, in all likelihood, bring them great sadness as the day they tragically lost both of their parents. Thus, we find that a wrongful death award of $200,000 per child, per parent for a total of $400,000 to each of the ten Davis Children is appropriate.

*1088 V.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed with respect to its finding that the Sheriff's Office was twenty percent at fault for the accident resulting in the deaths of Mary and Clement Davis. The trial court judgment is also affirmed with respect to the Davis Children's entitlement to wrongful death damages; however, we amend the trial court's judgment to increase the amount of damages awarded to $200,000 per child per parent for a total of $400,000 per child. Further, we reverse the trial court's judgment granting the Davis Children's motion for JNOV against the State Police and affirm the trial court's grant of the Davis Children's alternative motion for a new trial against the State Police and remand to the trial court for further proceedings. Costs in the trial court are assessed equally to Defendants-Appellants, Louisiana State Police, through the Department of Public Safety and Corrections and St. Martin Parish Sheriff's Office, through Sheriff Charles A. Fuselier, Jr. in the amount of $25,440.65.
AFFIRMED IN PART, REVERSED IN PART, AMENDED IN PART AND REMANDED IN PART.
DOUCET, C.J., dissents in part. I would reverse the Trial Court's finding that the St. Martin Sheriff's Office breached a duty owed to the Plaintiffs. Therefore, I would reverse the judgment against the Sheriff's Office. In all other respects, I agree with the majority opinion herein.
WOODARD, J., dissents in part and assigns written reasons.
SULLIVAN, J., dissents for the reasons ascribed by Chief Judge DOUCET.
WOODARD, J., dissenting in part.
"TO SERVE AND PROTECT" ... TO UPHOLD AND ENFORCE THE LAW the undisputed duty of law enforcement the duty which the State Police in the instant case breached, when it failed to enforce the LOUISIANA HIGHWAY REGULATORY ACT. As a result, two innocent people were killed.
I dissent from the majority's opinion in its reversal of the trial court's grant of the JNOV which found the State Police to be partially at fault. The majority reversed the trial court because it says that "the facts and inferences do not point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict." However, the controlling lawthe LOUISIANA HIGHWAY REGULATORY ACT which the majority apparently did not considerdictates otherwise.
At around 9:12 p.m., Mr. Witt was driving a 1987 Freightliner tractor with a 48' trailer, hauling 17 creosote, unilluminated poles 70' in length, extending 17' past the bed of his trailer. He did not have a red light or lantern at the end of his load. At the very least, he was in violation of La. R.S. 32:313 and 32:382(2)(A) of THE LOUISIANA HIGHWAY REGULATORY ACT, which, respectively, requires a light or lantern at the end of the load and which sets the length limit at 65', whether day or night. When there is any violation of the Act, the Act mandates enforcement, leaving no discretion to State Police.
La.R.S. 32:313 provides, in pertinent part:
Whenever the load upon any vehicle extends to the rear four feet or more beyond the bed or body of such vehicle there shall be displayed at the extreme rear end of the load, at the time specified in R.S. 32:301, a red light or lantern *1089 plainly visible from a distance of at least 500 feet to the sides and rear. The red light or lantern required under this Section shall be in addition to the red rear light required upon every vehicle.

La.R.S. 32:382(2)(A) specifies that:
The load carried by a combination of vehicles transporting timber poles and piling shall not exceed sixty-five feet plus one foot additional tolerance in length. The load carried by a combination of vehicles transporting forest products in their natural or treated state shall not exceed sixty-five feet plus one foot additional tolerance in length. Said combinations transporting poles and piling or forest products in their natural or treated state shall operate only during daylight hours and shall display a red flag or cloth not less than one foot square at the rear of the load. A combination of vehicles transporting forest products in their natural state shall be equipped with stationary vertical retaining poles on the driver's side of the trailer portion.
In other words, even a trucker who is complying with these length restrictions cannot be on the highway at night without being in violation of this law. Mr. Witt did not comply with the length restrictions nor did he comply with the lighting requirements. He was in violation of the Act, day and night. He was in violation when he called Sergeant Gros, a state policeman.
Sergeant Gros knew what Mr. Witt was carrying. He is presumed to know the law. Thus, he should have known that Mr. Witt was in violation of law. He had an undisputable duty to uphold and enforce the law. Reasonable minds cannot reach a contrary finding.
La.R.S. 32:388(A)(1) of the LOUISIANA HIGHWAY REGULATORY ACT particularizes a State Police Officer's duty in the instant case's context:
Whoever owns or drives any vehicle or combination of vehicles in violation of any rule, regulation, directive, or requirement of the secretary adopted pursuant to R.S. 32:380 through 385 or in violation of R.S. 32:380 through 385 shall be assessed a penalty of one hundred dollars for each violation.

And La.R.S. 32:389(C)(1):
Whenever any vehicle or combination of vehicles is found in violation of any provision of this Part or any regulation of the department or secretary adopted pursuant thereto, the weights and standards police officer or any state policeman shall take the name and address of the owner and driver and the license number of the vehicle and shall issue a violation ticket assessing a penalty for such violation in accordance with R.S. 32:388.
And most importantly, La.R.S. 32:392(A)(1), in pertinent part:

Upon discovery of any vehicle operated in violation of this Chapter, the vehicle shall not be impounded but shall be directed to and followed by the weights and standards police officer or state policeman to the nearest appropriate place suitable for unloading to its licensed gross weight or maximum size requirements as provided in this Chapter and storage of said product to preserve it for its intended use in commerce and in either case shall be detained or unloaded at the expense and responsibility of the owner or driver[.]
(Emphasis added.)
On the contrary, the State Police did nothing. Thus, it breached its duty to enforce and uphold the law. If it had fulfilled its duty, it would have issued Mr. Witt a ticket, directed and followed him out of the parking lot "to the nearest appropriate place suitable for unloading," *1090 and more probably than not Mr. Witt would not have killed this couple. Its inaction was, both, a cause-in-fact and legal cause of this fatal accident.
The majority implies that the State Police was absolved of its duty to do more than it didoffer Mr. Witt an escort, in the morning, for $50because Sergeant Gros testified that, in his first conversation with Mr. Witt, he was not sure of Mr. Witt's location and thought he had already received assistance. However, in Sergeant Gros' last conversation with Mr. Witt just moments before the collision, it is obvious that Sergeant Gros knew exactly where he was, that he was in State Police's jurisdiction, that he still needed and was desperate for help, and thus that there was still prophylactic action which Sergeant Gros could have taken. In a taped conversation, Mr. Witt stated to Sergeant Gros:
And I was talked, talked to a lady down here, Sergeant Breaux (the Sheriff's Office). She told me to pull on down to the Substation where I can turn around and get into the Wal-Mart parking lot. Wal-Mart said I can park it up there. I got as far down, I went too far past the Substation. So consequently, I'm at a place called Guidry's Specialty Meats parking lot. I'm on Highway 94 there but there is no way I can get out of here anymore. I'm going to have to back this truck, back out, and get it over to Wal-Mart where I got clear access. Consequently, now they are telling me I'm on a state highway, only State Police can help me now.

He, further, clarified:

I'm at a place called Guidry's Speciality Meats on Highway 94. About half a mile from the, past the Substation on 94. Going towards Lafayette [.] The problem is, if morning gets here I'm going to have to back my truck out.
(Emphasis added.)
Officer Gros responded, "In other words you can't get out of the parking lot at all?" Mr. Witt replied, "No. I'm going to have to back out." Then, Sergeant Gros offered to send him an escort in the morning for $50.00. When Mr. Witt refused, the two ended the conversation and hanged up. It was just after that call that Mr. Witt attempted to back out on his own and caused this accident.
I note with interest that the majority states, "Sergeant Gros, with knowledge that Witt's load of seventy-foot creosote poles that extended seventeen feet beyond the end of the truck's trailer presented a hazard on the road whether day or night, did not ask Witt whether he had been escorted by law enforcement personnel from the [sic] his previous location at the fruit stand. Further, Sergeant Gros, with knowledge of the possible danger of Witt's truck being on the road, did not get assurance from Witt that he would not move the truck from the meat store parking lot and did not offer any alternative to a $50.00 escort service when he knew that what Witt really needed was traffic control while he backed out of the parking lot." (Emphasis added.)
Indeed, when a law enforcement officer becomes aware of a dangerous traffic situation, such as this one, he has the affirmative duty to see that motorists are not subjected to unreasonable risks of harm.[1] Failure to act is negligence per say.[2] However, whether we classify this situation *1091 as dangerous or not is completely irrelevant. State Police's duty under this Act did not hinge on that assessment. Simply, when truckers violate restrictions concerning vehicles, such as Mr. Witt's, the LOUISIANA HIGHWAY REGULATORY ACT compels State Police to take action. This Act creates a mandatory duty which State Police in the instant case breached by not going to Mr. Witt, issuing him a ticket, and directing and following him "to the nearest appropriate place suitable for unloading." This action was not discretionary. Reasonable minds could not hold contrary to what the law mandates. Therefore, the JNOV was warranted and the majority has no basis for reversal.
Moreover, under such a well-defined Act, which the trial court properly followed in granting the JNOV, requiring the parties to unnecessarily re-litigate this case is a waste of economic and emotional resources and constitutes a gross miscarriage of justice.
NOTES
[1] At the time of the accident, Ms. Breaux was employed as an assistant communications supervisor at the rank of Sergeant for the Sheriff's Office.
[1] Monceaux v. Jennings Rice Drier, Inc., 590 So.2d 672 (La.App. 3 Cir.1991); Duvernay v. State, Dep't of Public Safety, 433 So.2d 254 (La.App. 1 Cir.1983), writ denied, 440 So.2d 150 (La.1983).
[2] Edwards v. Daugherty, 97-1542 (La.App. 3 Cir. 3/10/99); 729 So.2d 1112, writ denied, 99-1393 (La.9/17/99); 747 So.2d 1105.