STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

CA 04-584 consolidated with CA 04-585, CA 04-586


CHRISTOPHER SIMS

VERSUS

LIBERTY MUTUAL INSURANCE CO., ET AL.


**********


APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 177,821 C/W
HONORABLE WILLIAM ROSS FOOTE, DISTRICT JUDGE


**********


BILLY HOWARD EZELL
JUDGE


**********


Court composed of Sylvia R. Cooks, Elizabeth A. Pickett, and Billy Howard Ezell, Judges.


**AFFIRMED AS AMENDED.**

**James A. Bolen, Jr.**
**Gregory Engelsman**
**Bolen, Parker, & Brenner, LTD**
**P. O. Box 11590**
**Alexandria, LA 71315-1590**
**(318) 445-8236**
**Counsel for: Defendants/Appellees**
**Hixson-Hopkins Autoplex**
**Liberty Mutual Insurance Company**

**Roy Seale Halcomb, Jr.**
**Broussard, Bolton, Halcomb**
**P. O. Box 1311**
**Alexandria, LA 71309**
**(318) 487-4589**
**Counsel for: Secondary Plaintiffs/Appellants**
**Brian Croy (in cons. case)**
**Gerald Alan Croy (in cons. case)**
**Kathy Stanley (in cons. case)**
**Twyla Tanner (in cons. case)**

**Larry Alan Stewart**
**Staffard, Stewart & Potter**
**P. O. Box 1711**
**Alexandria, LA 71301**
**(318) 487-4910**
**Counsel for: Defendant/Appellee**
**Dennis Stephenson**

**Steven Patrick Mansour**
**Attorney at Law**
**P. O. Box 13557**
**Alexandria, LA 71315**
**(318) 442-4855**
**Counsel for: Secondary Plaintiff/Appellant**
**Christopher Sims**

**Randall Brian Keiser**
**Keiser, Auzenne & Boudreaux**
**P.O. Box 12358**
**Alexandria, LA 71315-2394**
**(318) 443-6168**
**Counsel for: Defendant/Appellant**
**City of Pineville**

**W. Jay Luneau**
**Luneau Law Office**
**1239 Jackson St.**
**Alexandria, LA 71301**
**(318) 767-1161**
**Counsel for: Secondary Plaintiff/Appellant**
**Terry M. Croy (in cons. case)**

**Stacy Christopher Auzenne**
**Auzenne Law Firm**
**3600 Jackson Street**
**Alexandria, LA 71303**
**(318) 880-0087**
**Counsel for: Defendant/Appellant**
**City of Pineville**

**EZELL, JUDGE.**

In this consolidated case, several issues are raised by the parties. The issues pertain to fault, damages, and insurance coverage.

### FACTS

On July 18, 1994, at approximately 10:20 p.m., Wayne Croy was driving his Ford Courier pickup truck south on Bragg Street in Pineville, Louisiana. Christopher Sims was a passenger in his truck. They were returning home from Mississippi. At the same time, Dennis Stephenson was driving a Ford Taurus heading north on Bragg Street. His niece, Erica Woods, was a passenger in the car. As Stephenson traveled along Bragg Street, he came upon a curve to the left. The wheels of the Taurus left the highway and, at some point, the vehicle reentered the highway, crossed the center and collided head-on with the pickup truck. The accident resulted in the death of Wayne Croy and serious injuries to Sims.

Terry Croy, Wayne's wife, filed survival and wrongful death actions. Wayne's four major children, Gerald Allen Croy, Kathy Stanley, Twyla Tanner, and Bryan Croy, also filed a wrongful death action. Sims filed suit for his injuries. Made defendants were the City of Pineville; Stephenson; his automobile liability insurer, Liberty Mutual Insurance Company; the owner of the Taurus, Hixson-Hopkins Autoplex of Alexandria; and Connie Lewis, the man who rented the vehicle from Hixson-Hopkins. The Plaintiffs alleged that the cause of the collision was the substandard condition of the roadway and the negligence of Stephenson.

The three separate suits were consolidated in the trial court. A bench trial was held on December 3 - 6, 2002. The trial court found the City of Pineville and Stephenson each fifty percent at fault for the accident. The claims against Hixson-Hopkins and Lewis were dismissed, and Liberty Mutual's coverage was limited to

1

$10,000.00 per person, $20,000.00 per accident. The City, Terry Croy, the Croy children, and Sims appealed the judgment. Croy also answered the appeal.

There are some preliminary matters that have been raised by the City. Therefore, we will address those issues first.

## DUE PROCESS

The City claims that it was deprived of its due process rights when brought into the suit nearly three years after the accident. The suits were originally filed in September and December of 1994. The City was made a defendant for the first time when Sims amended his petition for damages on March 14, 1997. The City claims that it was prejudiced because it entered into an intergovernmental agreement with the Rapides Parish Police Jury to overlay and stripe Bragg Street, which occurred on April 16, 1997, thereby, denying it the chance to have the street examined by an expert of its choosing as it existed at the time of the accident. The City filed applications for writs with this court and the supreme court when the trial court originally denied its exception of prescription in 1997.

"Review of an issue previously addressed by an appellate court is generally precluded by the law of the case doctrine." *Desselle v. LaFleur*, 03-562, p. 3 (La.App. 3 Cir. 2/4/04), 865 So.2d 954, 956. "This doctrine not only applies to those decisions of an appellate court that arise from the full appeal process but to all decisions of an appellate court, including decisions on writ applications." *Id.* "However, the law of the case doctrine does not absolutely bar this court from reconsidering its prior decisions; rather it is discretionary." *Id*.

None of the facts since the previous rulings by this court and the supreme court on the earlier writ applications have changed. Even it they had, we note that the supreme court has held that there is no due process violation under the Louisiana

2

Constitution or the United States Constitution because "[i]nterruption of prescription for solidary obligors is rationally related to the state's interest in providing full compensation to tort victims and holding defendants responsible for their delicts." *Picone v. Lyons*, 601 So.2d 1375, 1377 (La.1992).

## EXPERT TESTIMONY

Duaine Evans, a consulting engineer, testified on behalf of Plaintiffs as a traffic engineering and accident reconstruction expert. The City claims that his testimony should have been excluded because it strayed from known and accepted engineering standards. At the trial court level the City sought to exclude Evans' testimony because "he picks and chooses which factual testimony to rely on and reject in formulating his conclusion that Bragg Street in Pineville was defective at the time of the accident, July 18,1994."

Louisiana Code of Evidence Article 702 provides for the admission of expert testimony as follows: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." "A district court is accorded broad discretion in determining whether expert testimony should be held admissible and who should or should not be permitted to testify as an expert." *Cheairs v. State, Dep't of Transp. and Dev.*, 03-680, p. 6 (La. 12/3/03), 861 So.2d 536, 541. "A district court's decision to qualify an expert will not be overturned absent an abuse of discretion." *Id.*

The City cites *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167 (1999), in support of its argument that Evans' methodology strayed from accepted

3

standards. However, other than informing us what was the improper methodology, the City simply complains about the facts that Evans utilized in his conclusions. "'As a general rule, the factual basis for an expert's opinion goes to the credibility of the testimony, not its admissibility, and it is up to the opposing party to examine the factual basis of the opinion in cross-examination.'" *Amoco Prod. Co. v. Texaco, Inc.*, 02-240, p. 26 (La.App. 3 Cir. 1/29/03), 838 So.2d 821, 839 *writs denied*, 03-1102, 03-1104 (La. 6/6/03) 845 So.2d 1096, (*quoting Loudermill v. Dow Chem. Co.*, 863 F.2d 566, 570 (8 Cir. 1988)). Therefore, we find that the trial court properly admitted Evans' testimony.

## STATEMENTS

The City also claims that the trial court erred in not allowing the introduction of the parties statements taken by the city police. It claims that these statements are admissible as both business records of the city police department and because they were used to refresh a witness's recollection, specifically Officer Clyde Lemmons. The City wanted to introduce the statements of Sims, Stephenson, and Erica Woods, the passenger in the Stephenson vehicle.

These statements are obviously hearsay. La.Code Evid. art. 801(C). The City argues that the statements are admissible pursuant to Louisiana Code of Evidence Article 612(A) (writing used to refresh memory) and Louisiana Code of Evidence Article 803(6) (records of regularly conducted business activity).

We have reviewed Officer Lemmons' testimony referenced by the City in its brief and find that he was only asked if he took a statement from Sims. He never reviewed the statement nor testified about its contents. He did not use Sims' statement to refresh his memory. Furthermore, there is no reference to Woods' or Stephenson's statements.

4

Regarding the business records exception, Article 803(6) specifically provides that "[p]ublic records and reports which are specifically excluded from the public records exception by Article 803(8)(b) shall not qualify as an exception to the hearsay rule under this Paragraph." Article 803(8)(b)(i) provides that "[i]nvestigative reports by police and other law enforcement personnel" are excluded from the public records and reports exception to the hearsay rule.

Clearly, these statements were part of the police investigation of the accident. The trial court did not err in excluding these statements.

## NOTICE

The City claims that it had no notice of an unreasonably dangerous condition on Bragg Street as required by Louisiana Revised Statutes 9:2800. However, in *Jacobs v. City of Bunkie*, 98-2510 (La. 5/18/99), 737 So.2d 14, the supreme court held that the notice requirements of Louisiana Revised Statutes 9:2800 cannot be applied retroactively to causes of action which arose before the effective date of November 23, 1995, shared with the constitutional amendment to Article XII, § 10(C), which allowed the legislature to limit the liability of the state. *See also Bozeman v. State, La. Dep't of Transp. and Dev.*, 34,430 (La.App. 2 Cir. 4/4/01), 787 So.2d 357, *writ denied*, 01-1341 (La. 6/29/01), 794 So.2d 813.

This accident occurred on July 18, 1994. Therefore, the notice requirements of Louisiana Revised Statutes 9:2800 are not applicable to this case.

## LIABILITY

The City claims that the trial court erred in assessing it with any liability based on the defective condition of Bragg Street. It claims that it was Stephenson's excessive speed alone which was the cause of the accident. It is the City's contention that neither the maintenance, design, nor the condition of Bragg Street contributed in

5

any manner to the occurrence of the accident.

In an action asserting liability as the result of a defective condition based on Louisiana Civil Code Article 2317 before 1996, the plaintiff had to prove three elements:

> "(1) that the thing which caused the damages was in the care, custody, and control (garde) of the defendant; (2) that the thing had a vice, ruin, or defect that presented an unreasonable risk of harm; and (3) that the vice, ruin, or defect was the cause-in-fact of the plaintiff's damages." *Dupree v. City of New Orleans*, 99-3651, p. 5 (La. 8/31/00), 765 So.2d 1002, 1008.

"Whether a risk is unreasonable is 'a matter wed to the facts' and must be determined in light of the facts and surrounding circumstances of each particular case." *Id.* at 1012 (*quoting Celestine v. Union Oil Co. of Calif.*, 94-1868, p. 9 (La. 4/10/95), 652 So.2d 1299, 1304). "The custodian is absolved from his strict liability neither by his ignorance of the defect or vice, nor by circumstances that the defect could not easily be detected." *Id.*

Factors to be considered and weighed in determining whether a thing presents an unreasonable risk of harm are: "(1) the claims and interests of the parties; (2) the probability of the risk occurring; (3) the gravity of the consequences; (4) the burden of adequate precautions; (5) individual and societal rights and obligations; and (6) the social utility involved." *Id.*

In assessing liability, the trial court found that "[t]he combination of the drift off of the pavement in the curve, the corrective action and the drop off resulted in an inability to maintain control and the car crossed into the oncoming lane striking the Croy vehicle." While there was eyewitness and expert testimony concerning the placement of a speed limit sign apprising Stephenson on the speed, this obviously did not factor into the trial court's decision. There was also expert testimony as to the need for an advanced curve warning sign. However, this, too, did not factor into the

6

trial court's decision to assess the City with fault. The drop-off on the road is what the trial court found presented an unreasonable risk of harm.

Officer Russell L. Murdock, assistant chief of police with the Pineville police department, was on duty the evening of the accident and participated in the investigation. Officer Murdock testified that the tire tracks were visible in the grass on the right-hand shoulder. He explained that tire tracks started where the curve began and continued around the curve. In his previous deposition testimony, Officer Murdock stated that there was a three-to-four inch drop where the tires came back on the asphalt. Officer Murdock agreed that there was a problem with cars going off the edge of the road on this left-hand curve on Bragg Street when going faster than the speed limit. He explained that the shoulder was continually being built up because rainwater kept washing it away.

Paul McLain worked as the street department supervisor for the City for ten years. He is also Terry Croy's stepfather. McLain testified that for thirty-six years he lived about a mile-and-a-half from Bragg Street. He stated that people kept running off the side of the road in the curve so the City would have to put aggregate and asphalt in the area. McLain went to the scene of the accident the day after it occurred and observed a four-to-five inch drop-off where the Stephenson vehicle reentered the road.

Duaine Evans explained that drivers are more apt to run off the roadway when encountering a left-hand curve that is hidden, such as this one which was at the bottom of a hill. He testified that this creates a situation for a rut or drop-off. Evans testified that it is obvious that Stephenson had some control of the vehicle when his wheels were off the curve because the tracks followed the contour of the curve. He stated that the amount of drop-off that was observed by the witnesses would cause

7

steering problems. As Evans later stated, a three-to-four inch drop-off is a hazardous condition. Evans explained that a drop-off in a curve poses a greater hazard because more people are exposed to it more often since they tend to run off the road in this area. He opined that when Stephenson hit the drop-off is when the trouble began.

Evans admitted that it was a good practice of the City to place material on the edge to fill the drop-off. However, he believed that a different material should have obviously been used since there continued to be a problem and a need to place material in that area.

Dr. Judson Matthias, a civil engineer who testified on behalf of the City, while disagreeing that there was a drop-off, agreed that a drop-off on the outside of a left-hand curve can be very dangerous because if a person steers too much, the vehicle will go clear across the road. In deposition testimony, Matthias admitted that a drop-off could be a contributing cause of Stephenson coming back on the road at a sharp angle and shooting across the road.

There were no measurements of the drop-off taken by anyone. There were two witnesses who offered the observations of the level of the drop-off. The trial court found their testimony to be credible. While Matthias testified that he did not observe the drop-off in the pictures taken the day after the accident, Evans indicated that he could see a drop-off.

> An abrupt drop-off between a roadway and a shoulder constitutes a defect. *LeBlanc v. State, Department of Highways*, 419 So.2d 853 (La.1982). An implicit necessity for the use of a shoulder is a connection between the roadway and the shoulder that allows for safe, gradual movement from one to the other. *Sinitiere v. Lavergne*, 391 So.2d 821 (La.1980).

*Mathieu v. State, Dep't of Transp. and Dev.*, 598 So.2d 676, 679 (La.App. 3 Cir.), *writ denied*, 600 So.2d 665 (La.1992).

8

An appellate court will not disturb a trial court's factual findings unless there is a showing of manifest error. *Id.* Based on the evidence we have previously discussed, we cannot say the trial court erred in finding that the drop-off located in the left-hand curve on Bragg Street was unreasonably dangerous and a cause of the accident.

## DAMAGES

The trial court awarded the following damages:

| | |
|---|---|
| Gerald Croy | $40,000.00 wrongful death damages |
| Kathy Croy | $40,000.00 wrongful death damages |
| Twyla Croy | $40,000.00 wrongful death damages |
| Brian Croy | $125,000.00 wrongful death damages |
| Terry Croy | $100,000.00 survival action damages<br>$125,000.00 wrongful death damages<br>$156,494.00 past and future lost wages<br>$100.00 for loss of the pickup truck<br>$3,894.35 funeral expenses |
| Christopher Sims | $32,018.43 past medical expenses<br>$75,000.00 future medical expenses<br>$650,000.00 general damages |

The City claims that the damages awarded to Terry Croy, the Croy children, and Sims were excessive and should be reduced. On the other hand, Kathy, Twyla, and Gerald Croy claim that the award of $40,000.00 to each of them for the wrongful death of their father should be increased to $70,000.00 each. Terry Croy also claims that both the $100,000.00 awarded for the survival action of Wayne Croy and the award of $125,000.00 to her for wrongful death damages should be increased.

In *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1261 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994), the Louisiana Supreme Court explains the standard for appellate review of a trial court's general damages award:

9

[T]he discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.

**Terry Croy's Damages**

Survival and Wrongful Death Damages

The City argues that the damage award of $100,000.00 for Terry's survival action based on Wayne's pain and suffering and $125,000.00 for her own wrongful death damages are excessive. Contrarily, Terry argues that the awards are unreasonably low.

[T]he survival action and the wrongful death action are two separate and distinct causes of action that arise at different times, address themselves to the recovery of damages for different injuries and losses, and accrue to different tort victims. The survival action comes into existence simultaneously with the tort, permits recovery only for the damages suffered by the victim from the time of injury to the moment of death, and is transmitted to the victim's beneficiaries upon his death. Conversely, the wrongful death action arises only if and when the victim dies and compensates the beneficiaries for their own individual injuries that occur at the moment of the victim's death and thereafter.

*Boullt v. State Farm Mut. Auto. Ins. Co.*, 99-942, p. 8 (La. 10/19/99), 752 So.2d 739, 743-44 (citations omitted).

"The survival action in a suit resulting from the death of a tort victim includes recovery for pain and suffering, loss of earnings and other damages sustained by the victim up to the moment of death. Damages for pain and suffering are properly awarded if there is a scintilla of evidence of any pre-death pain or suffering by the victim."

*Mathieu*, 598 So.2d at 681.

The accident happened around 10:32 p.m. During the time before Wayne's death, there is no doubt that Wayne was conscious and suffered tremendously. Officer Lemmons testified that Wayne was definitely conscious and complaining of

chest pain when he arrived at the scene of the accident.

As further explained by Officer Murdock, Wayne was pinned between the steering wheel and the seat because the front end was crushed. The fire department had to remove him with the jaws of life. Officer Murdock testified that Wayne was coherent and had labored breathing. It was Officer Murdock's observation that Wayne's chest was crushed because he was in deep pain and moaning and groaning.

Dr. Wesley Dyer, a family practitioner who treated Wayne at the hospital, stated that Wayne was alert to person and place. He explained that Wayne had multiple lacerations to the head, face, left hand, and both knees, and broken bones in the left wrist, right hip, right knee. Dr. Dyer further commented that the hip injury consisted of the head of the bone penetrating through the socket into the pelvis. Dr. Dyer explained that the injuries would cause severe and substantial pain until the Code Blue at 11:45 p.m. when Wayne crashed.

Based on this evidence we cannot say that the trial court abused its discretion in its award of $100,000.00 as survival action damages. While Wayne suffered tremendously, it is clear that the suffering lasted only a little over an hour.

"Elements of damage for wrongful death are loss of love and affection, loss of services, loss of support, medical expenses and funeral expenses. Damages for wrongful death are intended to compensate the victim's beneficiaries for their compensable injuries following the victim's moment of death." *Id.* Separate awards were made for loss of wages and funeral expenses, so we will review the evidence indicating that Terry suffered a loss of love and affection, services, and incurred medical expenses as a result of Wayne's death.

Terry and Wayne were married in July 1989. She was thirty-three years old at the time. Terry admitted that she and Wayne did have marital problems at times, but

11

explained that this was mostly at the beginning of the marriage. Terry testified that Wayne was her best friend. Terry explained that Wayne helped her with housework and she helped him with yard work. She testified that she still misses her husband today and that the first year without him was very hard. Wayne's kids acknowledged that Terry and Wayne loved one another. McLain, Terry's stepfather, confirmed that Terry had problems for a year or longer following her husband's death.

There was also evidence that medical expenses for Wayne's care the night of his death totaled $3,086.29. Based on this evidence, we cannot say that the award of $125,000.00 for wrongful death damages was an abuse of discretion.

Economic Damages

Terry was awarded a total of $156,494.00 for past and future lost wages. The City claims that this award is unsupported by the record.

"Damages for loss of past wages are not necessarily limited to a multiplier of the amount earned at the time of injury." *Callihan v. Town of Vinton*, 95-665, p. 7 (La.App. 3 Cir. 12/6/95), 668 So.2d 735, 741. "It can be computed on the amount the plaintiff would in all probability have been earning at the time of trial." *Id*.

"It is well established that a loss of future earnings award is not merely based upon the difference between a plaintiff's earnings before and after a disabling injury. Such an award is predicted upon the difference between the plaintiff's earning capacity before and after the disabling injury." Id.

> Awards for loss of future income or future earning capacity are inherently speculative and insusceptible of calculation with mathematical certainty. The factors to be considered in determining future loss of income includes the plaintiff's physical condition before and after his injury, his past work record and the consistency thereof, the amount the plaintiff probably would have earned absent the injury complained of, and the probability that he would have continued to earn wages over the balance of his working life.

*Id*.

12

Terry had two daughters who lived with them. While Terry worked part-time as a substitute cook for the Rapides Parish School Board, it was Wayne that provided for the family. Terry testified that Wayne did work for a cab company six days a week. Several witnesses confirmed that Wayne worked for the cab company and even did some mechanic work at home on the side.

Terry testified that Wayne's employment with the cab company ended a few days before his death. As explained by Terry, Wayne would have had to continue working because there was no money to retire on since he did not have any type of retirement plan. Sims supported Terry's testimony stating that Wayne always had a job. At the time of the accident, Wayne and Sims were returning from Mississippi where Wayne was helping Sims with his business of painting reflective house numbers on the curb. Dr. William Culbertson, an economist, calculated Wayne's loss of earnings. He concluded that at the time of his death, Wayne had eleven-and-eight-tenths years of estimated work life remaining, at which time he would have been seventy years old. In computing loss of wages, Dr. Culbertson did not have the benefit of tax returns but was told by Wayne's family that he worked for a cab company earning $50 to $75 a day. Dr. Culbertson testified that he reviewed Terry's deposition and understood that Wayne had a falling out with the cab company, but he was also under the impression that there was an understanding that Wayne was to be hired back again. He took into consideration that Wayne worked six days a week. Dr. Culbertson did not include any income for the mechanical work that Wayne performed because there was no clear indication as to how much Wayne earned. Dr. Culbertson performed three different calculations based on earnings of $50 a day, $75 a day, and minimum wage. Earning $50 a day at six days a week, Dr. Culbertson concluded that the total loss for past and future economic loss was $156,494.00. This

is obviously the basis for the trial court's award.

Dr. Culbertson also took into account that Wayne would have used some of this income on himself and included a deduction of $46,833.00 for personal consumption. We find that the evidence supports awarding loss of wages at $50 a day for six days a week and affirm the trial court's award.

**Croy Children Damages**

Except for Brian, the Croy children were awarded $40,000 each for wrongful death damages. Brian was awarded $125,000. The City claims these awards to Wayne's adult children are excessive. The three Croy children, Kathy, Twyla, and Gerald, argue that the awards to them should be increased.

Except for Gerald, all the children lived near their father and saw him on a regular basis. Gerald lived in Georgia but kept in touch with his father. The children agreed that their relationship with their father was distant when their parents divorced. However, they testified that, after several years, their relationship with their father became better than it was before. The girls saw their father on a regular basis, and Gerald kept in touch with his father by telephone and visiting several times a year. They talked about the loss in their lives with their father's death and their disappointment that their young children would never know their grandfather. Terry confirmed that Wayne was close with his children.

Testimony revealed that Brian is mentally handicapped and the loss of his father has devastated him. When Wayne was alive, Brian would see his father every day because he lived across the street from his grandmother, Wayne's mother, who was still living when Wayne died. Brian testified that he has not gotten over his father's death.

14

While we find that these awards for wrongful death damages may be a little on the high side, we cannot say that the trial court abused its discretion.

**Christopher Sims' Damages**

The City argues that the awards of $75,000 for future medical expenses and $650,000 in general damages are unsupported by the evidence. Sims filed an appeal but did not request any relief in his brief.

The dash of the truck caved in on Sims. The jaws of life were used to remove him from the vehicle. He explained that there was a great deal of pain when he was pulled out the truck, with excruciating pain in the hip area.

While Sims may have survived the accident, he suffered severe injuries. The deposition of Dr. John Fritchie, an orthopedic surgeon who treated Sims at Huey P. Long Hospital, was introduced into evidence. At the time of trial, Dr. Fritchie was deceased. When Sims was admitted into the emergency room, he was diagnosed with several injuries, including: (1) pneumomediastinum, air leaking into an area within the chest cavity where the heart is located, (2) right mid-shaft femur fracture, (3) right talus fracture (one of the bones in the foot making up the ankle joint), (4) left posterior hip dislocation, (5) left femoral head fracture, (6) left patella tendon laceration, and (7) lacerations to the chin and right knee. Dr. Fritchie testified that these injuries were very severe and life-threatening.

While in the emergency room, a closed reduction on the left hip was performed to restore blood supply to the hip. Dr. Fritchie explained that Sims' hip dislocation was precipitated by a traumatic event causing the ball to come out of the socket. The next day, July 20, 1999, a closed reduction and intramedullary rodding of the right femur fracture was performed on Sims. During this time, an open reduction internal fixation of the right talus fracture as well as an open repair of the patella tendon

15

laceration of the left knee were also performed.  Several days later, on August 1, 1999, an open reduction internal fixation of the left femoral head fracture was performed on Sims.  This procedure was required because the ball of the ball-and-socket joint was fractured and it required better placement with screws.

While in the hospital Sims had some seizures.  Sims testified that he continues to have seizures and memory loss today.  Sims was in the hospital for three to four weeks.  When he returned home, he was in bed for three to four months and then progressed to a wheelchair.  During this time he had to use a bedpan and then a bottle for urination while in the wheelchair.  Sims remained in the wheelchair for four or five months and then began using crutches.  He could not do normal activities in excess of a year and had frequent headaches which have decreased.  This caused depression.  He explained that he now has six-inch incisions on both sides of his buttocks, scars on his knee, chin, and right ankle.  He continues to have pain in his hip, knees and ankle.

Dr. Fritchie had not seen Sims since he assisted with the surgery to repair his hip, so he did not want to offer an opinion as to Sims' disability without seeing him again.  Since Dr. Fritchie died, Sims was examined by Dr. Walter Foster, also an orthopedic surgeon.  Dr. Foster testified that Sims' injuries were severe and life-threatening at the time of the accident.  Dr. Foster stated that Sims will have future pain and discomfort as a result of the injuries.

Dr. Foster ordered x-rays and noted traumatic osteoarthritis of the left hip.  It was Dr. Foster's opinion that Sims will need a total hip replacement at young age, probably in about ten years.  Usually, a hip replacement is not attempted until age sixty. Dr. Foster explained that Sims would be on crutches for at least six weeks after surgery and would need physical therapy.  He also stated that there is a risk for

16

dislocation during the first three months. He testified that the cost of hip replacement surgery would be $25,000.00 to $30,000.00.

Dr. Foster also testified that, in a perfect world, the hip replacement would have a fifteen-year life span. Due to Sims' young age, he will probably need more than one replacement. Sims was only twenty-one years old at the time of the accident. Dr. Foster explained that each hip replacement becomes more significant and costs will go up on subsequent procedures.

Dr. Foster also opined that the rod in the right femur needs to removed because of the risk of infection. This is day-type surgery which would cost $5,000.00 to $6,000.00.

There is no doubt that Sims' injuries were very serious, have affected his life, and will continue to affect his life. We cannot say the trial court abused its discretion in its award of general damages to Sims.

This court in *Veazey v. State Farm Mut. Auto Ins.*, 587 So.2d 5, 8 (La.App. 3 Cir. 1991)(citations omitted), discussed the burden of proof required to support an award for future medical expenses:

> Future medical expenses, like any other damages, must be established with some degree of certainty. The plaintiff must show that, more probably than not, these expenses will be incurred. Awards will not be made in the absence of medical testimony that they are indicated and setting out their probable cost. An award for future medical expenses cannot be based on mere speculation of the jury. Much stronger proof, such as medical testimony of the specific expenses to arise, should be required for such an award.

Through Dr. Foster's testimony, there was ample medical evidence of the need for future hip replacements for Sims. Dr. Foster was also very specific about the costs and the fact that the costs would be higher with each successive surgery. Dr. Foster also indicated that the rod in Sims' leg needed to be removed and was very specific about these costs. We find no error in the trial court's award of future

17

medical expenses to Sims.

## INSURANCE COVERAGE

The Croy children and Terry argue that the trial court erred in finding that the Liberty Mutual insurance policy had limits of $10,000.00 per person, $20,000.00 per accident as opposed to $100,000.00 per person, $300,000.00 per accident.

The facts at trial indicated that Hixson-Hopkins rented cars under the Ford Rent-a-Car System with Liberty Mutual providing the insurance. Normally, the policies provided liability coverage of $100,000.00/$300,000.00. However, certain rental agreements have "cut-back" endorsements. Liberty Mutual argued that the rental agreement covering the Ford Taurus had a cut-back endorsement providing liability coverage of $10,000.00/$20,000.00/$10,000.00. A rental agreement for the Ford Taurus was introduced into evidence which was signed by Connie Lewis, as the customer. The agreement covered the time period of June 24, 1994 to July 24, 1994. At trial it was explained that the rental was month-to-month. Under the "**Vehicle Insurance**" section the policy provides:

> Licensee provides liability insurance coverage for persons using the vehicle with the permission of the Licensee as provided for in Paragraph 1 hereof (and not otherwise) in accordance with the provisions of an automobile liability insurance policy with limits equal to the minimum requirements of any applicable state financial responsibility law or other similar law or statute.

In finding that the lower limits of liability applied as provided by the rental agreement, the trial court analogized the testimony surrounding the signing of the rental agreement and stated in written reasons (emphasis in original):

> Plaintiff's [sic] effort to reform the contract to a long-term lease and avoid the clear language of the contract rests primarily on the testimony of Connie Lewis. Mr. Lewis's testimony was not only **not** credible, it bordered on incredible. Mr. Lewis's felony conviction arose from a multi-million dollar money-laundering scheme involving Lewis Meats, a company in which he seemed to claim an ownership interest when convenient. This company paid the high monthly rental payments for

18

the car at a time when the criminal activity was apparently running rampant. Mr. Lewis testified he thought this was a lease with a million dollars of insurance. He based this belief on a conversation with a prior employee of a predecessor corporation that occurred several years before the rental agreement at issue today. No corroborating evidence was produced. Even if the Court believed such a conversation happened and a different agreement existed in the 1980's, the contract for this car was clearly a monthly rental with clear language.

The only thing the Court finds credible in Mr. Lewis's testimony is that he would just sign when he got a new car and pay when they billed him monthly. He took full advantage of their (sic) being no limit to mileage, no maintenance costs and the ability to trade out different cars for shorter periods. Expense did not seem to be an issue since the payments were made by Lewis Meats, his vehicle for money laundering. A lack of extensive documentation in such a set up is understandable. Having examined the testimony and evidence the Court finds the agreement to be a Minimum Limits Rental Contract. But for Liberty's admitting coverage, with all the facts presented, this Court would find the contract clearly excluded coverage for Mr. Stephenson.

Liberty, for some reason, paid the stated policy limits of $10,000.00. Plaintiffs argue that is a waiver of a coverage defense and seek to impose the higher limits they allege were available to Hixson. Liberty provided Hixson with insurance in several layers. They could offer rental customers a Standard Limits ($100,000/$300,000) or a Minimum Limits ($10,000). Hixson was also a named insured for an excess policy of $10,000,000.00 [sic, $1,000,000.00]. These were policies to Hixson. The excess is clearly not available to the person renting the car. This would be coverage for Hixson for its actions.

Even with coverage extended to Stephenson the Standard Limit Contract is not mandated. The Court finds Lewis did not have a direct contractual relationship with Liberty. Hixson had no obligation to extend the upper limits. Testimony clearly showed it never did. Their standard procedure was to provide Minimum Limits Contracts only. What the predecessor corporation had done is irrelevant. Even a credible witness would not have created a verbal contract binding Hixson, a successor corporation, and altering the series of consistent written agreements. Mr. Lewis routinely entered the same agreement with Hixson. The conspiracy theory of backdating and resigning agreements is not proved by a preponderance of the evidence. The issue is "**what contract was in existence at the time of the accident?**" Accepting that the long-term use of rental cars was unorthodox application does not change the nature of several years of continued renewals of the Minimum Limits Contract with Hixson. With the exception of Mr. Lewis's testimony, which the Court finds completely unbelievable, nothing suggests any other agreement with Hixson to have ever existed.

On appeal the Plaintiffs have argued that the trial court erred in finding that Liberty Mutual did not waive a "coverage defense" of the $10,000.00/$20,000.00 liability limit because it did not notify Stephenson of the "cut-back" agreement. They claim that Liberty Mutual should have obtained a nonwaiver agreement to reserve the defense.

In *Lindsey v. Colonial Lloyd's Ins. Co.*, 595 So.2d 606 (La.1992), the supreme court discussed an insurance policy arrangement similar to the one involved in the present case. It recognized that there is "nothing repugnant to public policy or the insurance code in the 'two tier' insurance created by the combined policy and rental agreement." *Id.* at 607 (footnote omitted). The supreme court found that pursuant to the rental agreement, the insured agreed to be bound to the rental agreement's lower limits of coverage. *Also see Pitts v. Pickens*, 94-1811 (La.App. 1 Cir. 5/5/95), 655 So.2d 520, *writ denied*, 95-1895 (La. 11/13/95), 662 So.2d 469.

Lewis, and in turn Stephenson as his permissive driver, agreed to the terms of the rental agreement. In this case, Liberty Mutual issued an insurance policy to Ford Motor Company who in turn issued a rental agreement through its agent, Hixson-Hopkins, to Connie Lewis. Lewis signed the rental agreement which contained a section on the front entitled "WARNING" right above Lewis's signature. This section stated: "ONLY MINIMUM LIABILITY INSURANCE IS PROVIDED AS STATED ON THE REVERSE SIDE." As we have previously recited, the reverse side of the rental agreement provided for minimum liability insurance.

There was no need to notify Stephenson of that which was contained in the policy. Furthermore, policy limits are not a defense to coverage. Policy limits define the amount of coverage. As explained in 2 ERIC MILLS HOLMES ET AL., APPLEMAN ON INSURANCE, 2D § 8.1, at 302 (1996)(footnotes omitted),

20

> [T]he rules of waiver and estoppel can not be used to expand coverage that is specifically and unambigously excluded by the policy language. The position is strongly favored since to extend coverage through the use of the doctrine of waiver or estoppel will essentially rewrite the contract entered into by the parties. Thus, the doctrines should only be used to remove the insurer's ability to rely on certain exclusions, limitations or conditions but not to add new insuring agreements to the policy.

In other words to expand coverage to $100,000.00/$300,000.00 "would be a windfall, unforseen and totally outside the contemplation of all the parties . . . ." *Lindsey*, 595 So.2d at 614. Also see *Gambino v. Lamulle*, 97-2798 (La.App. 4 Cir. 6/10/98), 715 So.2d 574, where the fourth circuit held that a waiver argument was not available because the dispute was over the amount of coverage and not a policy defense that could be waived.

## PENALTIES

The Croy children and Terry further claim that the trial court erred in not assessing penalties against Liberty Mutual because it took the position that Stephenson was not covered by the policy. As is apparent from the previously quoted trial court's reasons for judgment, the trial court indicated its own determination that Stephenson was not covered under the Liberty Mutual Policy.

In *Dennison v. Liberty Mut. Ins. Co.*, 94-26 (La.App. 1 Cir. 11/10/94), 645 So.2d 1227, the first circuit found that coverage in a Liberty Mutual policy did not extend to the driver of a rented vehicle who was not listed as an additional driver under the terms of the rental agreement. The Liberty Mutual policy at issue contained the same provisions regarding covered drivers as the present case, which restricted insurance coverage to those persons named in the rental agreement as drivers. Only C.S. Lewis and Jason Lewis were listed as drivers on the rental agreement. Therefore, there would have been no coverage for Stephenson based on the reasoning in *Dennison*. We agree with the trial court that Liberty Mutual did not misrepresent

21

its coverage under the policy and could legitimately question its coverage concerning Stephenson.

## COURT COSTS

The Croy children complain that they were assessed with the deposition costs of Sue Wennihan, corporate representative of Hixson-Hopkins; Lee Brading, corporate representative of Liberty Mutual; Michael Pisari, another corporate representative of Liberty Mutual; and Charles Moore, head of the Department of Public Works for the City of Pineville. The Croy children argue that it was an abuse of discretion to order Plaintiffs to pay the costs of taking these depositions.

Louisiana Code of Civil Procedure Article 1920 provides, in pertinent part, that "the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable." The trial court's great discretion in assessing court costs will not be reversed absent an abuse of that discretion. *Frazier v. Zapata Protein USA, Inc.*, 02-605 (La.App. 3 Cir. 12/11/02), 832 So.2d 1141, *writs denied*, 03-126, 03-145, (La. 3/21/03), 840 So.2d 537, 539.

While the party cast with court costs is generally the party found liable, we cannot say the trial court abused its discretion in assessing the Plaintiffs with the costs of the Hixson-Hopkins deposition and Liberty Mutual depositions since they failed to succeed on the higher policy limits issue. However, we do find that it was an abuse of discretion to cast Plaintiffs with the costs of the City employee's deposition. We therefore, reverse that part of judgment.

In their appeal, the Croy children have also raised an error of the trial court in including only $9,330.90 as the total amount of court costs. They claim plaintiffs offered into evidence itemized bills of the clerk of court for each of the three consolidated cases which, added together, total $16,905.90.

22

Pursuant to Louisiana Revised Statutes 13:5112, an award of court costs against a political subdivision of the State shall be expressed "in a dollar amount in a judgment of the trial court or decree of the appellate court." It is apparent from the trial court's reasons for judgment that it intended to assess all costs, other than the deposition costs discussed above, against the City and Liberty Mutual equally. Therefore, we will enter judgment in this court in a sum certain of all court costs in the trial court and this court in the amount of $27,091.50 to be divided equally between the City and Liberty Mutual as the trial court did.

In accordance with the foregoing discussion, we reverse the trial court's assessment of the cost of Charles Moore's deposition and assess that cost to the City of Pineville. Costs in the trial court and of this appeal in the amount of $27,031.11 are to be divided equally between the City of Pineville and Liberty Mutual.

**AFFIRMED AS AMENDED.**